UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.*
ALEX GURION,

                              Plaintiff-Relator,

                    -v.-

SIGULER GUFF, LP; RUSSIA PARTNERS
MANAGEMENT, LLC; DATASPACE
PARTNERS, LLC; DREW J. GUFF;
VLADIMIR ANDRIENKO,

                              Defendants.

---

18 Civ. 4304 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff-Relator Alex Gurion brings this action against Defendants Siguler Guff, LP; Russia Partners Management, LLC; DataSpace Partners, LLC; and Drew J. Guff (collectively, "Defendants")[1] under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, in connection with a loan entered into between Defendants and the Overseas Private Investment Corporation ("OPIC"), a United States government agency that helps fund American businesses investing in emerging markets.  The Government has declined to intervene in this action, and now before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint (or "AC").  For the reasons that follow, the Court grants Defendants' motion in its entirety.

---

[1]     Defendant Vladimir Andrienko has not been served in this action, nor has Plaintiff moved for an extension of the service deadline set forth in Fed. R. Civ. P. 4(m). Accordingly, the Court will dismiss the case against Defendant Andrienko without prejudice.

## BACKGROUND[2]

### A.    Factual Background

### 1.    The Parties

Defendants comprise a series of entities and individuals affiliated with Defendant Siguler Guff, LP ("SG"), an American private equity firm that makes overseas investments.  (AC ¶¶ 4, 65).  Defendant Russia Partners Management, LLC ("Russia Partners"), is an affiliate of SG, and manages SG's Russian investments.  (*Id.* ¶ 66).  Certain funds managed by Russia Partners were invested in Defendant DataSpace Partners, LLC ("DataSpace"), a company created to build and operate data centers in and near Moscow, Russia.  (*Id.* ¶ 67).  Individual Defendant Drew J. Guff ("Guff") is a Co-Managing Partner and Founding Partner of SG and also serves as SG's Chief Investment Officer. (*Id.* ¶ 68).

Plaintiff-Relator Alex Gurion ("Plaintiff") was the CEO of Moscow Tyre Plant ("MTP"), a company that owned buildings that DataSpace "intended to transform into a data center cluster in downtown Moscow."  (AC ¶ 63).  Plaintiff

---

[2]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #34)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on the Loan Agreement between DataSpace and OPIC, which is incorporated by reference in the AC, and which is included as Exhibit 3 to the Declaration of Yelena Kotlarsky in Support of Defendants' Motion to Dismiss the AC ("Loan Agreement" (Dkt. #39-3)).  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #38); to Plaintiff's memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #43); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #47).

additionally owned WinNet, a real estate management company, which was also involved in leasing building space to DataSpace.  (*Id.* ¶¶ 14, 64).

### 2.    The OPIC Loan

The events underlying this case are alleged to have begun with Defendants' desire, in or about 2010, to build and operate data centers in Russia.  In connection with their efforts to raise capital for this project, Defendants sought funding from OPIC, given the overseas nature of the project.  (*See* AC ¶ 71).  These efforts were successful, and on September 27, 2010, OPIC signed a $150 million letter of commitment with several subsidiaries of SG, including DataSpace.  (*Id.* ¶¶ 5-6).  At or about the same time, Plaintiff and WinNet leased certain buildings to a DataSpace affiliate, Femida LLC ("Femida"), for the affiliate to develop additional data facilities in Russia.  (*Id.* ¶ 64).

After signing the letter of commitment, but before entering into an actual loan agreement, OPIC conducted due diligence on DataSpace and the data center project in which OPIC would be investing.  (AC ¶¶ 137, 187, 260).  For example, OPIC engaged Turner & Townsend, a consulting company, to conduct a due diligence investigation and sent representatives to Russia for site visits.  (*Id.* ¶ 137).

Following this due diligence, on September 16, 2011, OPIC executed a Loan Agreement with DataSpace, with the other SG subsidiaries functioning as guarantors.  (AC ¶¶ 5, 78; *see also* Kotlarsky Decl., Ex. 3 (the "Loan Agreement")).  The Loan Agreement provided for a loan of up to $150 million for

the construction and development of data centers in the Moscow area and required DataSpace to receive the loan funds in several tranches of disbursements.  (AC ¶ 78).  The Loan Agreement further detailed certain "Events of Default" that would give OPIC the right to demand repayment or otherwise act in response to a defaulted loan.  (*Id.* ¶ 91).  These "Events of Default" included (i) making an incorrect material representation in any financing document (*id.* ¶ 87); (ii) failing to comply with certain covenants and obligations (*id.* ¶¶ 88-89); and (iii) any other "event, development, or circumstance … that, in the reasonable judgment of OPIC" had a material adverse effect on the Agreement (*id.* ¶ 90).  As relevant here, the Loan Agreement specified that

> if any Event of Default has occurred … OPIC may at any time do any one or more of the following: (i) suspend or terminate the Commitment, (ii) declare, by written demand for payment, any portion or all of the Loan to be due and payable … or (iii) without notice of default or demand, proceed to protect and enforce its rights and remedies by appropriate proceedings or actions.

(*Id.* ¶ 91).  Importantly, the Loan Agreement did not require OPIC to demand repayment in the event of default, but rather gave it the discretion to demand repayment.  (*Id.* (reciting that "OPIC *may* at any time" invoke the repayment obligation (emphasis added))).

DataSpace received its first and only tranche of funds from OPIC on September 29, 2011, in the amount of $45 million.  (AC ¶¶ 52, 174).  Between 2011 and 2013, DataSpace entered into seven waiver agreements with OPIC due to "stalled performance and noncompliance with the development

4

timetable set in the Loan Agreement," which problems, absent the waivers, would have put DataSpace in default under the loan agreement.  (*Id.* ¶ 267).

On January 15, 2015, DataSpace defaulted on the OPIC loan, being unable to pay the first principal loan repayment, and subsequently requested a standstill agreement for permission to submit a restructuring proposal.  (AC ¶¶ 51, 110).  OPIC consented to this agreement based on DataSpace's revised financial projections, and a conditional standstill agreement was executed on April 14, 2015.  (*Id.* ¶ 110; *see* Dkt. #43-1 at 2).  Subsequently, in a letter dated July 9, 2015, Donald Spencer, the Managing Director at Russia Partners, provided OPIC with a Loan Restructuring Proposal "requesting an extension of the Loan Maturity Date and the Grace Period of the OPIC Loan."  (Dkt. #43-1 at 2).[3]  Specifically, the Loan Restructuring Proposal requested a reduction of the loan size from the initial $150 million to $95 million (*id.* at 3), as well as "an extension for the availability of the loan second tranche of $50 million, through January 15, 2018" (AC ¶ 53; *see also* Dkt. #43-1 at 3).

Ultimately, however, the Loan Agreement was never restructured, and the data center project proved unsuccessful, with Defendants constructing just one data center and determining that it would be impossible to use the

---

[3]     While the Court acknowledges Defendants' argument that the loan restructuring correspondence attached to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss (*see* Dkt. #43-1), should have been included as an exhibit to the AC, it finds that the document is incorporated by reference in the allegations of the AC (*see* AC ¶ 29 n.8 (citing a "Loan Restructuring Proposal dated July 9th, 2015, signed by Donald P. Spencer, Managing Director, Russia Partners Management, LLC")), and therefore properly within the scope of materials to be considered on the motion to dismiss.  *See DiFolco*, 622 F.3d at 111 (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

intended buildings for future construction.  (AC ¶¶ 106, 138).  In consequence, in or about 2015, Defendants terminated the lease agreements with Plaintiff. (*Id.* ¶¶ 213-216).  Plaintiff subsequently sued Defendants in Russian court for rent arrearages, spawning a protracted litigation that lasted roughly from 2016 through 2019, and that Plaintiff maintains was beset with bribery and misconduct.  (*See id.* ¶¶ 135-153, 261-266 (detailing the events of the Russian litigation)).  Plaintiff was ultimately unsuccessful in this litigation, and WinNet subsequently filed for bankruptcy and has been liquidated.  (*Id.* ¶ 160; Def. Br. 5)

### 3.    Defendants' Alleged Misconduct in Russia

Plaintiff alleges a litany of misconduct, in connection with both Defendants' operations in Russia and their lease agreements with Plaintiff and WinNet, while Defendants' OPIC-financed data center project was ongoing.  Of greatest relevance, Plaintiff maintains that, on several occasions, Defendants, and DataSpace in particular, paid bribes to Russian officials to secure construction permits for the data center, and to keep the project generally on track.  For example, Plaintiff alleges that SG hired a "fixer" and paid him over $800,000 to obtain the construction permit for the data center (AC ¶¶ 173, 244), and further that DataSpace agreed to pay an "official fine" and purchase thirteen computers for a local school to facilitate the construction process of the data center (*id.* ¶ 163).  Plaintiff also accuses Defendants of bribing Russian tax officials in 2013 in exchange for $10 million in VAT refunds to "keep the OPIC-funded data center project afloat" (*id.* ¶ 218), and otherwise

making "bogus" agreements with four fake companies to facilitate receiving a fraudulent VAT refund of approximately $1.5 million (*id.* ¶ 243).  Plaintiff even alleges that at some point SG paid $7.8 million into Plaintiff's offshore accounts so that Plaintiff could bribe the government-run Moscow grid energy company and thereby receive lower electricity rates for the data center project.  (*Id.* ¶¶ 194-197).

Separately, Plaintiff complains of alleged corruption engaged in by Defendants in connection with the Russian litigation between Plaintiff's and Defendants' subsidiaries over the lease agreements entered into in connection with the data center project.  (*See, e.g.*, AC ¶ 209 (alleging that Defendants sought to avoid paying WinNet millions of dollars under the Russian lease agreements by reorganizing the specific company that owed WinNet lease payments); *id.* ¶¶ 262-264 (alleging that Defendants bribed Russian judicial officials during the litigation "for the purpose of securing legal victory against WinNet")).

As Plaintiff tells it, such conduct violated the False Claims Act, inasmuch as Defendants "l[ied] to OPIC about [their] progress on the [data center] project, [their] plans for corporate restructuring, and [their] bribery of municipal officials in Moscow" in order to "avoid triggering the loan's default repayment obligations."  (AC ¶ 50).  Furthermore, Plaintiff alleges that Defendants fraudulently induced OPIC to disburse loan funds to DataSpace and relatedly misled OPIC regarding future financial and logistical projections.  (*Id.* ¶ 49).

### B.    Procedural Background

Pursuant to Section 3730(b) of the FCA, Plaintiff filed a *qui tam* complaint under seal on May 15, 2018.  (Dkt. #1, 13).  Between May 2018 and February 2023, the case remained sealed as the Government investigated the allegations pursuant to Section 3730(b)(2) of the FCA.  On February 23, 2023, the Government filed its Notice of Election to Decline Intervention, and the Court therefore issued an Order directing the unsealing of the complaint.  (*See* Dkt. #10, 11, 14).  On March 28, 2023, the complaint was unsealed in light of Plaintiff's intention to continue with the action.  (Dkt. #11, 13).

After receiving an extension of the answer deadline, Defendants, on July 21, 2023, filed a pre-motion letter seeking to file a motion to dismiss. (Dkt. #22).  Plaintiff filed a pre-motion letter in opposition on August 1, 2023 (Dkt. #26), and on August 4, 2024, the Court held a pre-motion conference on Defendants' anticipated motion (*see* August 4, 2024 Minute Entry; Dkt. #29 (Transcript of Proceedings)).  At that conference, the Court granted Plaintiff leave to file an amended complaint, and set a briefing schedule for Defendants' motion to dismiss.  (*Id.*).

Plaintiff filed his Amended Complaint, the operative pleading in this action, on October 13, 2023 (Dkt. #34), and filed exhibits to the Amended Complaint a few days later (Dkt. #36).  Defendants moved to dismiss the Amended Complaint on November 17, 2023.  (Dkt. #37-38).  Plaintiff filed his brief in opposition initially on January 5, 2024 (Dkt. #42), and then filed a

revised version of his brief in opposition on January 8, 2024 (Dkt. #43).

Finally, Defendants filed their reply brief on January 19, 2024.  (Dkt. #47).

**DISCUSSION**

**A.     Applicable Law**

**1.     Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiffs'

favor, assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life

Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted);

see also *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face."  (internal quotation marks

omitted)).  A plaintiff is entitled to relief if he alleges "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S.

544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir.

2007) ("While *Twombly* does not require heightened fact pleading of specifics, it

does require enough facts to nudge plaintiffs' claims across the line from

conceivable to plausible." (internal quotations marks omitted) (citing *Twombly*,

550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal

conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517

F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation marks omitted);

*see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2.   Actions Arising Under the False Claims Act

### a.   FCA Actions Generally

The False Claims Act prohibits false claims against government funds. *See* 31 U.S.C. § 3729.  Under the FCA, "individuals are authorized to 'bring a civil action for a violation of [the Act] for the [complaining] person and for the United States Government.'" *United States ex rel. Kreindler & Kreindler* v. *United Technologies Corp.*, 985 F.2d 1148, 1153 (2d Cir. 1993) (quoting 31 U.S.C. § 3730(b)(1) (1988)) (alterations in *Kreindler*).  In particular, a party, often termed a "relator," *Kreindler*, 985 F.2d at 1153, may commence an action by filing a *qui tam* complaint, 31 U.S.C. § 3730(b)(1).  After the action is brought, the complaint must remain sealed for at least 60 days, *id.* § 3730(b)(2), and the Government may extend the duration of the sealing period by applying to the court and showing good cause, *id.* § 3730(b)(3).

"The action is brought in the name of the government, and the government may either intervene and prosecute the action, or allow the original plaintiff — the *qui tam* relator — to proceed with the suit under § 3730(b)(4)(B)." *Kreindler*, 985 F.2d at 1153 (internal citations omitted). "While relators indisputably have a stake in the outcome of False Claims Act *qui tam* cases that they initiate, 'the Government remains the real party in interest in any such action.'" *United States ex rel. Mergent Servs.* v. *Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008) (quoting *Minotti* v. *Lensink*, 895 F.2d 100, 104 (2d Cir. 1990)).  However, "[w]hether or not the government joins in the action, the relator is entitled to a portion of the proceeds if the prosecution is successful." *Kreindler*, 985 F.2d at 1153.

### b.     Direct and Reverse False Claims

In this case, Plaintiff alleges two theories of liability arising under the FCA, a direct false claim and a "reverse" false claim.  The former, a direct false claim, requires a plaintiff to show that the defendants (i) "made a claim," (ii) "to the United States Government," (iii) "that is false or fraudulent," (iv) "knowing of its falsity," and (v) "seeking payment from the federal treasury." *Coyne* v. *Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (summary order) (quoting *United States ex rel. Kirk* v. *Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010)); *see* 31 U.S.C. §§ 3729(a)(1).  Simply put, a direct false claim involves a request for government funds, knowingly made under false pretenses.

By contrast, a reverse false claim involves a false or fraudulent misrepresentation to the Government to avoid complying with a payment

obligation.  *See* 31 U.S.C. § 3729(a)(1)(G).  To state a claim under this theory, a plaintiff must show that "[i] the defendant made a false record or statement [ii] at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property" to avoid complying with that obligation.  *United States* v. *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 287 (E.D.N.Y. 2016) (quoting *United States ex rel. Kester* v. *Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 367-68 (S.D.N.Y. 2014)).  More specifically, "a relator must point to a payment obligation that is already due and not contingent on the Government's enforcement decision."  *United States ex rel. Miller* v. *Citigroup Inc.*, No. 19 Civ. 10970 (DLC), 2022 WL 2237619, at *3 (S.D.N.Y. June 22, 2022).  "A duty to pay ... must be formally established before liability can arise."  *United States ex rel. Grubea* v. *Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018) (internal quotation marks omitted).

### c.    Rule 9(b) and FCA Claims

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *United States ex rel. Chorches* v. *Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (citing *United States ex rel. Ladas* v. *Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016)).  Rule 9(b) generally requires that when a party alleges fraud, that party "must state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b). Particularity, in turn, requires that a complaint "[i] specify the statements that the plaintiff contends were fraudulent[;] [ii] identify the speaker[;] [iii] state

where and when the statements were made[;] and [iv] explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81 (quoting *Ladas*, 824 F.3d at 25).

The weight of authority in this Circuit supports the proposition that, for claims brought under §§ 3729(a)(1)(A) and (a)(1)(B), Rule 9(b)'s particularity requirement applies not only to allegations of fraudulent schemes, but also to the submission of false claims. *See N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 288 (explaining that "allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity," and that FCA claims must also "allege the particulars of the false claims themselves"); *United States ex rel. Forcier* v. *Comput. Scis. Corp.*, 183 F. Supp. 3d 510, 520-21 (S.D.N.Y. 2016) (explaining the same); *United States ex rel. Kester* v. *Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 257-58 (S.D.N.Y. 2014) (explaining the same). Although this often requires a plaintiff to "provide details of actual bills or invoices submitted to the government," *see Chorches*, 865 F.3d at 93, a plaintiff may allege that fraudulent claims were submitted based on information and belief where (i) the plaintiff "make[s] plausible allegations that the bills or invoices actually submitted to the government were uniquely within the defendant's knowledge and control," and (ii) the plaintiff "adduce[s] specific facts supporting a strong inference of fraud," *United States ex rel. Gelbman* v. *City of New York*, 790 F. App'x 224, 248 (2d Cir. 2019) (summary order) (internal brackets omitted) (quoting *Chorches*, 865 F.3d at 83). However, "while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be

13

mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *O'Brien* v. *Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Wexner* v. *First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

**B.    The Court Grants Defendants' Motion to Dismiss**

As discussed, Plaintiff alleges that Defendants violated the FCA primarily by making a reverse false claim, in which Defendants made misrepresentations to avoid triggering the repayment obligation to the Government pursuant to the Loan Agreement.  Plaintiff also alleges FCA violations extrinsic to the Loan Agreement, namely two post-loan direct false claim allegations, arising out of alleged claims submitted to OPIC following the first and only disbursement of funds, and a fraudulent inducement claim, alleging that Defendants made false representations regarding DataSpace's compliance with anti-corruption laws and future construction plans and intentions.  The Court addresses each claim in turn, ultimately finding that Plaintiff's theories either are foreclosed by the FCA and the terms of the Loan Agreement, are otherwise time-barred, or are inadequately pleaded.  Accordingly, the Court grants Defendants' motion to dismiss in its entirety.

**1.    Plaintiff Has Not Adequately Alleged a Reverse False Claim**

The Court begins with Plaintiff's reverse false claim theory, in which Plaintiff maintains that Defendants "knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States[,] and knowingly concealed

and improperly avoided or decreased [such an] obligation" under the Loan Agreement.  (AC ¶ 284 (citing 31 U.S.C. § 3729(a)(1)(G))).  For a reverse FCA claim to prevail, a plaintiff-relator must allege that a defendant made a false statement to avoid "a payment obligation that is already due and *not contingent on the Government's enforcement decision.*"  *Miller*, 2022 WL 2237619, at *3 (emphasis added); *see also United States ex rel. Barrick* v. *Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1231 (10th Cir. 2017) ("[T]here is no liability for obligations to pay that are merely potential or contingent"); *United States ex rel. Ibanez* v. *Bristol-Myers Squibb Co.*, 874 F.3d 905, 922 (6th Cir. 2017) (an "obligation" under the FCA does not include "those contingent obligations that arise only because the government has prohibited an act, or arising after the exercise of government discretion" (internal quotation marks omitted)); *United States ex rel. Simoneaux* v. *E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016) ("For FCA liability to attach, there must be an 'established' duty 'to pay or transmit money or property to the Government.'" (quoting 31 U.S.C. § 3729(a)(1)(G)); *cf. United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 119-20 (2d Cir. 2021) (holding that liability to repay funds overpaid by the Government as a consequence of a false claim is not an "obligation" creating a reverse false claim, but is instead the basis for a traditional direct false claim).

Plaintiff may well be correct that a conditional payment obligation arose in connection with DataSpace's 2015 default of the loan.  Still, Plaintiff's reverse false claim theory is foreclosed by the express terms of the Loan Agreement, which reserve the Government's discretion to enforce such a

default, and the Government's ultimate decision not to enforce the repayment

obligation pursuant to the default.  In particular, the Loan Agreement itself

gave OPIC discretion to demand repayment of the loan in the event of a breach:

> [I]f any Event of Default has occurred … OPIC *may at any time* do any one or more of the following: (i) suspend or terminate the Commitment, (ii) declare, by written demand for payment, any portion or all of the Loan to be due and payable … or (iii) without notice of default or demand, proceed to protect and enforce its rights and remedies by appropriate proceedings or actions[.]

(AC ¶ 91 (emphasis added)).

Accordingly, and contrary to Plaintiff's argument that the 2015 Default or

other alleged instances of misconduct triggered a direct repayment obligation,

the Loan Agreement specifically provided that all repayment obligations in

connection with Events of Default would be "contingent on the Government's

enforcement decision," and therefore could not automatically come due until

the Government made the determination to enforce the default.  *Miller*, 2022

WL 2237619, at *3.  Put slightly differently, any defaults by Defendants under

the Loan Agreement created only a "duty that [was] dependent on a future

discretionary act [by OPIC]," and therefore did not give rise to the "established

duty" recognized by the FCA's statutory definition of "obligation" for the

purposes of reverse false claims.  *See United States ex rel. Petras* v. *Simparel,

Inc.*, 857 F.3d 497, 504-05 (3rd Cir. 2017) (quoting 31 U.S.C. § 3729(b)(3)).

Plaintiff similarly misses the mark in arguing that Defendants breached

material provisions of the Loan Agreement, because the materiality *vel non* of

the breached provisions triggered only a contingent, rather than a direct,

repayment obligation.  *See Barrick*, 878 F.3d at 1231 (noting that "potential obligations are not properly the subject of a suit under the reverse-false-claims provision" (alteration adopted and internal quotation marks and citation omitted)).  In this case, OPIC expressly declined to enforce the repayment obligations under the loan, and instead granted waivers to Defendants to permit the project to go forward.  (AC ¶ 267).  Defendants therefore could not have made any false claim to avoid a payment obligation in violation of the FCA, because the actual payment obligation never materialized.  *See Barrick*, 878 F.3d at 1231 (noting that "a duty to pay must be formally established before liability can arise under the [FCA]" (internal quotation marks omitted)).  Plaintiff's reverse FCA claim thus fails.

### 2.     Plaintiff Has Not Adequately Alleged a Post-Loan Direct False Claim

Next, Plaintiff maintains that Defendants made direct false claims by misrepresenting details about DataSpace's compliance with anti-corruption laws and its progress on the data center project following the initial disbursement of loan funds.  As set forth below, however, the Court finds that Plaintiff's claims fail because they lack any articulable nexus to an actual claim for payment from OPIC.

To state a claim under §§ 3729(a)(1)(A) and (a)(1)(B), a plaintiff must show that the defendants (i) "*made a claim*," (ii) "to the United States Government," (iii) "that is false or fraudulent," (iv) "knowing of its falsity," and (v) "seeking payment from the federal treasury." *Coyne*, 717 F. App'x at 28 (quoting *Kirk*, 601 F.3d at 113) (emphasis added).  Plaintiff argues that

17

DataSpace's 2015 request to restructure the loan was a claim and was based on misrepresentations regarding the future of the project.  (AC ¶ 29; *see generally* Dkt. #43-1).  However, the Court finds that Plaintiff has not established that Defendants actually made any claim to OPIC for funding beyond the initial execution of the Loan Agreement, whether via the Loan Restructuring Proposal or any other communication between DataSpace and OPIC.

In particular, Defendants' communications with OPIC after the Loan Agreement was executed in September 2011 do not constitute a "claim" under the FCA.  As discussed, the communications between DataSpace and OPIC following the first disbursement of loan funds fall into two general categories: (i) requests for waivers of the Events of Default (*see* AC ¶ 267); and (ii) letters setting forth DataSpace's April 14, 2015 request for a standstill agreement and its subsequent July 9, 2015 request to restructure the Loan Agreement (*see* Dkt. #43-1 at 2).  The former category, *i.e.*, the waivers signed by OPIC and DataSpace, simply functioned to rectify what would have otherwise been breaches of the Loan Agreement and Events of Default, but did not themselves constitute requests for additional funds from OPIC.  (AC ¶¶ 56, 267).  As to the latter category, neither the fact that DataSpace requested a standstill agreement on January 15, 2015, nor its later submission of a restructuring proposal, establishes that DataSpace submitted a request for funding.

Plaintiff is similarly unavailing in his self-serving characterization of the Loan Restructuring Proposal as an attempt "to obtain an additional $50 million

of OPIC finance."  (AC ¶ 29).  Even accepting all well-pleaded facts in the
Amended Complaint and relevant exhibits as true, the Loan Restructuring
Proposal simply requested that the terms of the Loan Agreement be adjusted,
and to that end included an itemized list of which terms should be changed,
but did not request additional disbursement of funds.  (Dkt. #43-1 at 2-4).  In
fact, the Loan Restructuring Proposal requested a reduction in the total loan
amount, from $150 to $95 million.  (*Id.* at 3).  The Loan Restructuring Proposal
therefore did not constitute a "claim" that could be alleged to be false under the
FCA.

The Court is further unmoved by Plaintiff's laundry list of alleged
misconduct engaged in by Defendants in connection with their Russian
operations.  It is well-established that the FCA "does not encompass those
instances of regulatory noncompliance that are irrelevant to the government's
disbursement decisions."  *Mikes* v. *Straus*, 274 F.3d 687, 697 (2d Cir. 2001).
Moreover, Rule 9(b) requires that a relator go beyond simply describing a
fraudulent scheme and consequently must provide allegations that "support[] a
strong inference that false claims were submitted *to the government*."
*Chorches*, 865 F.3d at 85 (emphasis in original); *see also United States* v.
*Canzoneri*, No. 20 Civ. 505 (LJV), 2023 WL 4082378, at *7 (W.D.N.Y. June 20,
2023) (dismissing statutory *qui tam* claims because plaintiff-relator's claims
were "grounded in speculation about bills that might have been submitted").

In this case, Plaintiff's allegations include claims of bribery, money
laundering, and other illicit activities in Russia on the part of Defendants in

connection with their receipt of the first and only loan disbursement from OPIC. Yet these allegations, which are vigorously disputed by Defendants, do not support the "strong inference that false claims were submitted to the government," as they implicate conduct happening after the original loan disbursement. *Chorches*, 865 F.3d at 85 (emphasis omitted). Moreover, the alleged Russian misconduct cannot support liability under the FCA in connection with the post-loan communications between Defendants and OPIC, insofar as the conduct did not bear on any further decisions by OPIC to provide Defendants with additional funds, and was therefore immaterial to the relationship between OPIC and Defendants.

As the Second Circuit instructs, "[a]n alleged 'misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable' under the FCA." *Coyne*, 717 F. App'x at 28-29 (quoting *Universal Health Servs., Inc.* v. *United States*, 579 U.S. 176, 192 (2016)). To be material, the Government must have "made the payment 'as a result of the defendant's alleged misconduct.'" *Id.* at 29 (quoting *United States ex rel. Ge* v. *Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 124 (1st Cir. 2013)). Here, Defendants' alleged regulatory noncompliance is particularly irrelevant to the Government's disbursement decisions because it occurred, if at all, after DataSpace's solicitation of funds from OPIC pursuant to the Loan Agreement, and did not result in any further payouts from OPIC. At best, Plaintiff's allegations amount to an insufficient invocation of a "*per se* rule that if sufficient allegations of misconduct are

made, it necessarily follows that false claims and/or material false information were filed," which approach "violates the specificity requirements of Rule 9(b)," and thus cannot support a claim under the FCA. *Ge*, 737 F.3d at 124. Ultimately, because Plaintiff has not established that Defendants made any relevant misrepresentations when "seeking payment from [OPIC]," *Coyne*, 717 F. App'x at 28, before the first and only loan disbursement, nor in connection with any subsequent claim for funding from OPIC, Plaintiff's direct FCA claims also fail.

### 3.   Plaintiff's Fraudulent Inducement Claim Is Time-Barred and Otherwise Fails to Satisfy Rule 9(b)

Finally, Plaintiff's Amended Complaint offers new allegations to support a fraudulent inducement claim, namely that Defendants falsely represented DataSpace's compliance with anti-corruption laws and made false representations about future building plans and intentions. The Court agrees with Defendants, however, that these new allegations are both time-barred and insufficiently specific to pass muster under Rule 9(b). The Court addresses each issue in turn.

#### a.   Plaintiff's Fraudulent Inducement Claim Rests on Time-Barred Allegations

First, Defendants argue that Plaintiff's new allegations in his Amended Complaint (*see generally* Dkt. #34) are time-barred and therefore ought to be dismissed irrespective of their merits (Def. Br. 20-21). Specifically, Defendants argue that Plaintiff impermissibly added to the Amended Complaint the allegations of Defendants' misrepresentations relating to "[i] future financial

projections; [ii] the suitability of buildings for the construction of a data center; [iii] the timing of future construction and operating permits; [iv] the use of OPIC loan proceeds; and [v] [Plaintiff's] own bribery scheme." (*Id.* at 21).[4] Defendants contend that these new allegations are time-barred because they were made well past the limitations period allowed under the FCA. (*Id.* at 20-21). The Court agrees.

An action under the FCA must be brought six years after the underlying violation occurred or three years after the violation is discovered by, or should have been discovered by, the Government, up to a maximum of ten years after the violation occurred. 31 U.S.C. §§ 3731(b)(1)-(2). In this case, Plaintiff does not dispute that the allegations giving rise to the fraudulent inducement theory necessarily predate the September 16, 2011 date on which the parties entered into the Loan Agreement, and therefore fall outside of the ten-year limitations period under the FCA. (*See* Pl. Opp. 24-25). Rather, Plaintiff, relying on threadbare citation to caselaw, suggest that the amended allegations arise from the same nexus as did those in the original complaint, thereby providing a basis to avoid the statute of limitations. (*Id.*).

While Plaintiff does not identify the specific rule undergirding his argument, his cited cases concern the "relation back" of an amended complaint to the date of the original pleading, as authorized by Rule 15. Fed. R. Civ. P. 15(c). (*See* Pl. Opp. 24-25 (citing *Rochester* v. *Sixth Precinct Police Station*,

---

[4]     The original Complaint lacked these allegations and instead focused on Defendants' payment of an "official fine" and donation of computers to a local school, allegedly in exchange for an expedited construction permit. (*See* Dkt. #13 (Complaint) ¶¶ 41-43).

370 F. App'x 244 (2d Cir. 2010) (summary order); *Phoenix Light SF Ltd.* v.

*Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540 (S.D.N.Y. 2022); *United States*

*ex rel. Raffington* v. *Bon Secours Health Sys., Inc.*, 567 F. Supp. 3d 429

(S.D.N.Y. 2021))).  Under the relation back doctrine, "an amended pleading

relates back to the date of a timely filed original pleading and is thus itself

timely even though it was filed outside an applicable limitations period."

*Krupski* v. *Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010) (internal quotation

marks omitted).

 In the FCA context, however, where a relator may initiate a *qui tam*

action with a sealed, *ex parte* submission, the Second Circuit has sharply

limited a relator's ability to use Rule 15(c) to relate back allegations in an

amended complaint to the date of the original action.  *See United States* v. *The*

*Baylor Univ. Med. Ctr.*, 469 F.3d 263 (2d Cir. 2006).  In particular, the Second

Circuit has held that Rule 15(c)(1)(B), which permits relation back where the

amended pleading asserts allegations transactionally related to those in the

original pleading, is "unavailable in suits brought pursuant to [31 U.S.C.]

§ 3730(b)'s procedural requirements," as "'[t]he secrecy required by § 3730(b) is

incompatible with Rule 15(c)(1)(B).'"  *Hayes* v. *Dep't of Educ. of City of New*

*York*, 20 F. Supp. 3d 438, 448-49 (S.D.N.Y. 2014) (alteration adopted)

(reasoning that because "the touchstone for relation back pursuant to

[Rule 15(c)(1)(B)] is notice," and "the seal provision of § 3730(b) [by design]

deprives the defendant in an FCA suit of the notice usually given by a

complaint," the requirements of Rule 15 cannot be met (quoting *Baylor*, 469 F.3d at 269)).

Nor is it the case that Rule 15(c)(1)(A) would apply, which otherwise permits relation back when "the law that provides the applicable statute of limitations allows relation back."  Fed. R. Civ. P. 15(c)(1)(A).  In this case, the FCA "explicitly permits a form of relation back under Rule 15(c)(1)(A) that unmistakably benefits *only* the Government and not relators."  *Hayes*, 20 F. Supp. 3d at 449 (emphasis in original) (citing 31 U.S.C. § 3731(c) (containing only an explicit relation back provision for Government complaints-in-intervention, and remaining silent as to relation back of *qui tam* complaints)). Accordingly, "[t]he FCA taken as a whole can no longer fairly be read to provide implicit support for Rule 15(c)(1)(A) relation back for the claims of relators," thereby foreclosing any other possibility of Plaintiff's attempt to defeat the statute of limitations.  *Id.* at 449-50.  Plaintiff's new allegations are therefore time-barred, and must be dismissed.

### b.   Plaintiff Has Otherwise Failed to Meet the Pleading Requirements of Rule 9(b)

Finally, Defendants argue that, even if the new allegations were not time-barred under Rule 15, they are not "pled with sufficiently particularity to survive Rule 9(b) nor sufficient plausibility to survive Rule 8(a)."  (Def. Br. 10). For the reasons set forth below, the Court finds that the new allegations fail under Rule 9(b), and therefore need not reach Defendants' arguments as to Rule 8.

As discussed elsewhere in this opinion, liability under the FCA is specifically concerned with "the claim for payment" and does not simply attach to a relator's allegations of "underlying fraudulent activity or [] the government's wrongful payment." *United States ex rel. Bilotta* v. *Novartis Pharmaceuticals Corp.*, 50 F. Supp. 3d 497, 510 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). To that end, courts not only employ the heightened pleading standard of Rule 9(b) when assessing FCA claims, *Chorches*, 865 F.3d at 81, but also require relators to provide sufficiently specific details about the relevant claim to payment to ensure "fair notice of a plaintiff's claim" and protect "defendant[s'] reputations from improvident charges of wrongdoing," *United States ex rel. Gelbman* v. *City of New York*, 790 F. App'x 244, 247 (2d Cir. 2019) (summary order) (internal quotation marks omitted), *cert. denied*, 140 S. Ct. 1296 (2020). A relator must therefore provide "a description of the [i] the specific statements that are alleged to be fraudulent; [ii] the identity of the speaker; [iii] where and when the statements were made; and [iv] why the statements were fraudulent." *United States ex rel. Askari* v. *PharMerica Corp.*, No. 20 Civ. 5089 (GBD), 2022 WL 4280391, at *3 (S.D.N.Y. Sept. 15, 2022) (citing *United States ex rel. Bassan* v. *Omnicare, Inc.*, No. 15 Civ. 4179 (CM), 2021 WL 1063784, at *8 (S.D.N.Y. Mar. 19, 2021)); *see also United States ex rel. Thompson* v. *Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (holding that application of Rule 9(b) to FCA claims "requires that a plaintiff set forth the who, what, when, where, and how of the alleged fraud" (internal quotation marks and citation omitted)).

25

Once again, Plaintiff's sweeping allegations of Defendants' misconduct in Russia fall well short of the mark in supplying sufficiently specific details under the Rule 9(b) standard for any fraudulent inducement claim.  For one, Plaintiff provides insufficient detail to support his claim that DataSpace made false representations about its compliance with anti-corruption laws.  Even construing the allegations in Plaintiff's favor, the fact that DataSpace paid an "official fine" to a local Russian town council in order to secure a construction permit for the data center, while perhaps coercive, does not establish that DataSpace bribed a foreign government official, as required to establish liability under the Foreign Corrupt Practices Act.  *See* U.S. DEP'T OF JUST. & ENFORCEMENT DIV. OF THE SEC, *FCPA, A Resource Guide to the U.S. Foreign Corrupt Practices Act* 19 (2d ed. 2020) (advising that "[t]he FCPA prohibits payments to foreign officials, not to foreign governments" (emphasis omitted)).

Likewise, Plaintiff cannot clear the high bar set by Rule 9(b) with his provocative and self-serving allegations that he himself paid what were "intended to be" bribes with money he received from an SG affiliate.  (AC ¶¶ 194-201).  Beyond his own say-so, Plaintiff does not explain that the funds he received from Defendants were intended to be used corruptly, as bribes or otherwise, and instead offers only conclusory statements that hint at bad conduct on the part of Defendants.  (*See, e.g.*, AC ¶ 197 (asserting that Plaintiff's "offshore companies [] were obviously not the right interlocutors to negotiate with Moscow government" about electricity prices, without specifying why or how such negotiations would take place or that such negotiations were

improper)).  *See United States ex rel. Piacentile* v. *Amgen, Inc.*, No. 04 Civ. 3983 (SJ) (RML), 2021 WL 5631958, at *12 (E.D.N.Y. Dec. 1, 2021) (finding that Rule 9(b) is not satisfied where "[t]he allegations . . . amount to a few general and/or conclusory sentences"), *aff'd sub nom. Piacentile* v. *U.S. Oncology, Inc.*, No. 22-18, 2023 WL 2661579 (2d Cir. Mar. 28, 2023) (summary order).

Finally, Plaintiff fails to provide sufficient detail to support his claim that Defendants made false representations about their future building plans and intentions to OPIC in order to secure the loan.  Plaintiff asserts that DataSpace made false representations about its financial projections (AC ¶ 107), its intention to build additional data centers (*id.* ¶ 103), and the timing and mechanics of obtaining construction and operating permits (*id.* ¶¶ 167-168, 200).  In making these allegations, Plaintiff references communications between DataSpace and OPIC detailing changing construction plans, yet provides no specific evidence that those statements were intentionally misleading.  (*See, e.g.*, *id.* ¶¶ 187-188).  The Court cannot infer that a fraud was perpetrated on the Government based on a loan recipient's change of plans.  Indeed, Plaintiff himself concedes that financial and other forecasting "cannot always be correct" (*id.* ¶ 107), and that DataSpace kept OPIC updated on its changing plans and financial condition (*id.* ¶¶ 110, 173), thereby acknowledging that statements made to OPIC may not have been fraudulent. Ultimately, Plaintiff's fraudulent inducement claims leave the Court "to speculate as to the specific design and implementation of a scheme that purportedly defrauded the federal government," an exercise that it cannot do.

*Gelbman*, 790 F. App'x at 248-49. To the extent Plaintiff's fraudulent inducement claims are not time-barred, which they are, they likewise fail to satisfy the requirements of Rule 9(b) and must therefore be dismissed.

## CONCLUSION

For the reasons detailed above, the Court GRANTS Defendants' motion to dismiss Plaintiff's Amended Complaint with prejudice as to each of them. In addition, the Court DISMISSES Plaintiff's Amended Complaint without prejudice as to Defendant Vladimir Andrienko.

The Clerk of Court is directed to terminate all pending motions, including the pending motion at docket entry 37, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      July 8, 2024
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge